AO 106 (Rev. 01/09) Application for a Search Warrant

# United States District Court
### for the
### Western District of New York

In the Matter of the Search of Information Associated with
Snapchat Username:

**Joseph_Lopez34**

**Case No. 17-mj-1162**
**(FILED UNDER SEAL)**

THAT IS STORED AT PREMISES CONTROLLED BY SNAP, INC.

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment A, Property to Be Searched,**
**which is attached hereto and incorporated herein by reference**

located in the Central District of California, there is now concealed:

**See Attachment B, Particular Items to Be Searched for and Seized,**
**which is attached hereto and incorporated herein by reference.**

The basis for search under Fed. R. Crim. P. 41(c) is:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of **Title 18, United States Code, Sections 1071 and 1073**.

The application is based on these facts:
- ☒ continued on the attached sheet.
- ☒ Delayed notice of ___60___ days (give exact ending date if more than 30 days: ___1/27/2018___) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

JAMES BONA
DEPUTY US MARSHAL
UNITED STATES MARSHALS SERVICE

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  November 28, 2017

_____
*Judge's signature*

JEREMIAH J. MCCARTHY
UNITED STATES MAGISTRATE JUDGE

City and state:  Buffalo, New York

*Printed name and Title*

## ATTACHMENT A

### Property to be Searched

The search warrant applies to information associated with the following Snapchat Username that is stored at premises owned, maintained, controlled, or operated by Snap, Inc., a company headquartered in Venice, California:

1.    Snapchat Username: **Joseph_Lopez34**

## ATTACHMENT B

### Particular Items to be Search for and Seized

1.   Information to be Disclosed by Snapchat

To the extent that the information described in Attachment A is within the possession, custody, or control of Snap, Inc. ("Snapchat"), including any messages, records, files, logs or information that have been deleted but are still available to Snapchat, or have been preserved pursuant to a request made under 18 U.S.C. 2703(f), Snapchat is required to disclose the following information to the government for the usernames listed in Attachment A:

a.   Basic subscriber information for the Snapchat accounts described herein, consisting of email addresses, phone numbers, account creation dates, timestamps and IP addresses for account logins/logouts and all contact and personal identifying information, including full name, user identification number, birth date, gender, Snapchat passwords, Snapchat security questions and answers, physical address (including city, state, and zip code), screen names, websites, and other personal identifiers;

b.   Logs, including sender, recipient, date, and time, concerning the previous Snaps sent to or from the Snapchat accounts with the usernames described herein;

c.   All photographs and videos uploaded by those usernames, and all photographs and videos uploaded by any user that have that user tagged in them;

d.   All profile information; Friend list, including Friends' Snapchat username; and information about the user's access and use of Snapchat applications;

e.   All other records of communications and messages made or received by the users, including all private messages; and

f.   All IP logs, including all records of the IP addresses that logged into the account.

2.    <u>Information to be Searched for and Seized by the Government</u>

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 1071 and 1073 from December 22, 2016 through the present, including information pertaining to the following matters:

a.    Any communication containing language tending to facilitate concealing a person from arrest and/or flight to avoid prosecution;

b.    Evidence indicating how and when the Snapchat account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Snapchat account owner;

c.    Evidence indicating the Snapchat account owner's state of mind as it relates to the crimes under investigation;

d.    The identity of the person(s) who created or used the username, including records that help reveal the whereabouts of such person(s).

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

STATE OF NEW YORK   )
COUNTY OF ERIE        )      SS:
CITY OF BUFFALO      )

I, JAMES BONA, being duly sworn, deposes and says:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Criminal Investigator employed by the US Marshals Service with over

(7) years of experience.  I have (2) additional years of experience as a US Customs and Border

Protection Officer in Buffalo, NY totaling over (9) years total law enforcement experience.

As such, my main duties as a Deputy US Marshal consist of investigating the whereabouts of

federal, state and local fugitives, as I am assigned to the New York/New Jersey Regional

Fugitive Task Force.

2.      As a Deputy US Marshal, I attended a 21 ½ week long training academy in the

Federal Law Enforcement Training Center (FLETC) in Glynco, GA.  During this academy I

received education in many areas of law enforcement investigations, but specifically including

fugitive investigations and apprehension, and the use of electronic surveillance (i.e.

computers, cell phones) as it relates to these areas.  In addition to the training I received in

the academy, I have also attended computer investigation classes after graduation, including

a two-day Social Networking Conference in which information was presented relating to the

tracking of online communication and using online social networking portals ( e.g. Facebook,

Twitter, Snapchat, etc.) as investigative and analytical tools.

3.       During the course of my career, I have been a lead or assisting case agent in dozens of criminal cases in which information pertaining to the whereabouts fugitives had been derived from computers, social media networking websites and other electronic devices. In most of these cases, electronic communication information had been obtained by the use of a court order, or had been intercepted in real time, and subsequently traced back to the fugitive.  As such, I have had to apply for and have received search warrants and other court orders in the past to assist in my efforts to locate and apprehend fugitives, and these documents have aided me in the apprehension of said fugitive wanted for crimes in violation of local, state and/or the federal government statute.

## PROBABLE CAUSE

4.       On December 22, 2016 Joseph Andres LOPEZ (hereinafter LOPEZ) was interviewed by Erie County Sheriff Detective Emily Nelson-Gerken regarding allegation of sexual misconduct reportedly committed by LOPEZ.  LOPEZ admitted to Det. Nelson-Gerken that he has committed several acts of sexual misconduct on two of his foster sisters and two of his foster cousins, whose ages did range from 4-10 at the time of the assaults. LOPEZ came to the interview with his father, Jose LOPEZ, and another person claiming to be his brother.

5.       On July 14, 2017 a warrant was issued for the arrest of LOPEZ by the Honorable Paul B. Wojtaszek, pursuant to an indictment having been found accusing LOPEZ of (2) counts of Sexual Conduct Against a Child in the First Degree, a class B felony in violation of P.L §

130.75(1)(a), and (1) count of Sexual Conduct Against a Child in the Second Degree, a class D felony in violation of P.L. § 130.80(1)(a) in the New York State Penal Law.

6.      On July 25, 2017 the US Marshal Service's New York/New Jersey Regional Fugitive Task Force (hereinafter referred to as "the RFTF") contacted Nelson-Gerken and offered to assist the Erie County Sheriff's Department in the apprehension of LOPEZ. Nelson-Gerken accepted my proposal, and shared case information with me, and the United States Marshals Service assumed primary apprehension responsibilities for LOPEZ (I was assigned as the lead case agent).

7.      I spoke to numerous law enforcement officials and investigative authorities regarding LOPEZ.  One agent that I spoke to was Mike Kessler of Erie County Child Protection Services.  Kessler told me that during his prior interviews with LOPEZ he did notice a very strong sense of closeness between LOPEZ and his family during his interviews, specifically his mother, and aunt Lila QUINONES.

8.      On July 26, 2017 the RFTF attempted to serve the arrest warrant for LOPEZ at two addresses in Buffalo: one located at 24 Sumner Place, Buffalo, NY where LOPEZ was believed to be currently residing with family; and another located at 188 Grant Street in the upper apartment, Buffalo, NY where LOPEZ was believed to have resided in the past with his mother, Violeta QUINONES. At 24 Sumner Place, I spoke to Angel VAZQUEZ, the lone resident home at the time.  VAZQUEZ claimed to be LOPEZ's cousin, and told me that he wasn't aware of where LOPEZ could be because VAZQUEZ had recently moved to

3

Buffalo from Puerto Rico. When I asked whom LOPEZ's other family or friends are in the area that the RFTF should speak to, VAZQUEZ replied that he would not give those names to me because "(LOPEZ) is my family". At 188 Grant Street, I spoke to LOPEZ's mother, Violeta QUINONES. QUINONES said she had not seen or heard from LOPEZ in months, and knows nothing of his whereabouts. QUINONES went on to claim that "he should be in town because he doesn't have any money". Further, QUINONES suggested that the RFTF inquire about LOPEZ's whereabouts in Eden, NY where LOPEZ resided with his foster family, and which was also the address that the alleged criminal misconduct took place at. Lastly, QUINONES would not provide the RFTF with any minor details about other family or friends, such as LOPEZ's siblings that were her children, which were living in the area that could be questioned in order to corroborate QUINONES' claims.

9.        On July 28, 2017 the RFTF applied for a search warrant of LOPEZ's Facebook profile "JoJo Quinones", which was known to be used by LOPEZ and provided to me by ADA Beth Solek, the prosecutor on the case. The search warrant was signed by the Honorable James A. W. McLoed. The results of the warrant are itemized below:

a.        The records showed private conversations between LOPEZ and several of his family members. Some of these private conversation involved LOPEZ requesting family members assisting him moving to Florida, or possible Puerto Rico. In a conversation that begin on January 10, 2017 between LOPEZ and his mother Violeta QUINONES, LOPEZ asks QUINONES, "Mami can you talk to Cisco to see if he can help me…And to see if I can go over there too". LOPEZ later clarifies to QUINONES that "Cisco" is Javier DE LA TORRES, LOPEZ's uncle that resides in Bradenton, FL. In the same conversation, QUINONES inquires as to whether or not LOPEZ spoke to "Kira", who I know to be Kiramaite MOLINA, LOPEZ's sister and

4

QUINONES' daughter.  LOPEZ said, "Mami I talk(sic) to Kira about me going to Florida… She side(sic) yes but I just need to talk to him".  It is in this conversation that the "him" referred to by LOPEZ is DE LA TORRES.

b.      On January 11, 2017 LOPEZ reached out to DE LA TORRES and asked, "Do you think I can go over there so I can go to school over there ok like you can help me or something".  DE LA TORRES stated LOPEZ was welcomed in his home, but that he needed to speak to his fiancé before giving final approval.

c.      LOPEZ also asked him mother, "Or should I told(sic) to titi? To see if I can stay with her or something bc she going back over there".  I know "titi" is a reference to Lila Haydee QUINONES, LOPEZ's aunt and Violeta QUINONES' sister.

d.      On January 10, 2017, LOPEZ asks Lila Haydee QUINONES if she is in Puerto Rico.  Lila Haydee QUINONES stated that she was in Puerto Rico, and to this LOPEZ stated "Can I go over lol".  Lila Haydee QUINONES responded that she was moving to Florida, and so LOPEZ asks, "I want to go to school over there can you help me because I don't want to be over here anymore".  Lila Haydee QUINONES responded in Spanish to LOPEZ, "Jojo I'm living in a motel I still do not have an apartment You will have to leave live(sic) with my husband and also the brother of he goes there with me when I go when you have an apartment, then you can."

e.      In a conversation between LOPEZ and Ana COOKE, whom I believe to be closely related to LOPEZ, LOPEZ tells COOKE he wants to head to Florida immediately and wants to attend school there.

f.      On March 20, 2017 LOPEZ claimed to a close friend of his that he would be moving to Florida "in the summer".

g.      On January 28, 2017 LOPEZ has a conversation with QUINONES in which QUINONES tells LOPEZ that a letter came to her house. LOPEZ says, "Will(sic) wtf they side(sic) that they close the fucking case tho wtf". In the same conversation, LOPEZ says to QUINONES, "So do I have to do something". I inquired to ADA Solek what was significant with this communication, and she confirmed that he received a target letter from the Grand Jury.

h.      During the last several months in which LOPEZ used his Facebook profile, there were numerous times in which LOPEZ stated to other family members that he was at "Kira house", or "Adrian house", where Adrian is known by me to be Adrian LOPEZ, LOPEZ's older brother. On March 16, 2017 LOPEZ claimed to be living at MOLINA's house with her and their father, Jose LOPEZ. On February 7, 2017 LOPEZ tells his mother he can't leave Adrian's residence because, "Adrian(sic) kids are sick and he's sleeping".

i.      LOPEZ told some of his friends on Facebook that his Snapchat username was **Joseph_Lopez34**. On February 2, 2017 LOPEZ's sister MOLINA asks LOPEZ to use the Snapchat application when a conversation begun between the two of them regarding a meeting with LOPEZ's lawyer.

10.     The USMS in the Middle District of Florida interviewed DE LA TORRES and Lila QUINONES in August of 2017, after conducting extensive surveillance on them and their residences. Both family acknowledged that LOPEZ reached out to them regarding moving to Florida, but that the plans never came to fruition. DE LA TORRES suggested LOPEZ may be in Puerto Rico, because there is a lot of family down there.

11.    In August of 2017, I received a confidential tip that LOPEZ was working for a cleaning company that cleaned Kohl's department stores in the Buffalo area.  LOPEZ's supervisor was contacted and he confirmed that LOPEZ was fired from the job, but was working under the name Jonathan LOPEZ, DOB: 7/17/91, SSN: XXX-XX-6753.  This information was known by me to belong to LOPEZ's brother Jonathan LOPEZ, who lived with Violeta QUINONES at 188 Grant Street, Buffalo, NY.

12.    On August 29, 2017, the RFTF applied for a search warrant of LOPEZ's IP address logins on his Facebook profile, which were provided by Facebook Inc. in the records returned in the aforementioned search warrant.  This search warrant was signed by the Honorable John L. Michalski.  The results of this search warrant showed that LOPEZ last signed onto his Facebook profile on June 12, 2017 in Puerto Rico.  In the days leading up to this last login, LOPEZ signed onto his profile from two different cell phones: 716-370-6860, a phone number known by me to be used by LOPEZ at that time; and 716-436-9711, a phone number subscribed to and used by Angel VAZQUEZ (I originally interviewed VAZQUEZ on July 26, 2017 at 24 Sumner Place, Buffalo, NY).

13.    On September 8, 2017, Kiramaite MOLINA was interviewed at her residence, along with LOPEZ's father, Jose LOPEZ.  MOLINA indicated she knows nothing about her brother, and hasn't "really seen him in years", due to the fact that he grew up in Eden. MOLINA suggested that RFTF interview LOPEZ's foster family.  LOPEZ's father was questioned by RFTF members, and he claimed he has had no contact with LOPEZ and

doesn't know where he is. Neither family members gave RFTF members any more details or information that could be used to corroborate their claims.

14.      Angel VAZQUEZ's phone records were analyzed and it was discovered that the Liberty Cab Company in Buffalo, NY was called by his phone eighty-seven times between 7/1/2017 and 8/11/2017.  I spoke to the cab company, and two different cab drivers identified LOPEZ being the client that used the cab services on several occasions, and that he used the alias "Angel".  One driver in particular remembered that LOPEZ was picked up at 197 Smith Street, Buffalo, NY, the address at which VAZQUEZ was residing, and was dropped off at or near 160 Leroy Street, Buffalo, NY the address at which LOPEZ's sister Kiramaite MOLINA resides.  The vast majority of cab trips were to/from 197 Smith Street to/from either 160 Leroy Street, 24 Sumner Place or 224 Leroy Street, an address that was known to be used by Luis MATIAS, Kiramaite MOLINA's husband and LOPEZ's brother-in-law, for narcotics trafficking until MATIAS' arrest by DEA agents in September of 2017.

15.      In early October of 2017, I spoke to two confidential sources (CS's) that gave information on LOPEZ.  The CS's stated that they were "good friends" with Jonathan LOPEZ, but knew LOPEZ to drive his older brother around in a blue Acura sedan.  The CS's indicated Jonathan LOPEZ sold heroin, lived at 188 Grant Street, and that LOPEZ was often with his brother at 188 Grant Street.  The CS's stated that Jonathan LOPEZ had said to them that his brother was wanted by authorities, but dismissed this fact saying that the charges stemmed from an issue between LOPEZ his girlfriend at the time of allegations.  One CS remembered Angel VAZQUEZ from a picture I showed him, and he said he believed

8

VAZQUEZ to be Jonathan LOPEZ's "plug", which is a term I am familiar with that means a narcotics supplier.  Finally, the CS's stated that they believed the family, specifically Jonathan and LOPEZ's sister Kiramaite MOLINA paid for a plane ticket to get LOPEZ to Puerto Rico.

16.    Between October and November of 2017, 197 Smith Street was extensively surveilled by RFTF members, to include the use of off-site surveillance technology for a period of approximately 30 days.  LOPEZ was never located, but VAZQUEZ did live at the residence with his girlfriend and their infant child.  A confidential source (CS) in the neighborhood was interviewed and was shown a picture of LOPEZ.  The CS identified LOPEZ and claimed he believed LOPEZ resided in the residence with VAZQUEZ, but that he hadn't seen LOPEZ in "over a month".

17.    On October 3, 2017 I requested that the United States Attorney's Office open an Unlawful Flight to Avoid Prosecution case against LOPEZ.  My request was honored and Assistant US Attorney Stephanie Lamarque was assigned the case.

18.    On October 10, 2017 RFTF believed they witnessed LOPEZ entering his sister's residence at 160 Leroy Street, Buffalo, NY.  The person witnessed was actually Jonathan LOPEZ, LOPEZ's older brother.  Jonathan LOPEZ gave the false name of "Jonathan MOLINA" when encountered by RFTF members because of the existence of a local warrant for his arrest.  I asked Jonathan LOPEZ about his brother LOPEZ using his name and social security to work for a cleaning company earlier in the year, and Jonathan

LOPEZ claimed he had no knowledge of this. While on scene, Kiramaite MOLINA was also interviewed a second time by RFTF members. This time, MOLINA indicated she was tired of us looking for Joe LOPEZ, and was willing to cooperate with authorities. MOLINA stated she hasn't spoken to LOPEZ in a few months, but that she knows her mother, Violeta QUINONES, speaks to him often. MOLINA also indicated that the blue Acura in which LOPEZ was known to drive – which was registered to MOLINA under New York State registration HBL 6306 – was sold by LOPEZ to his girlfriend "Baeba". MOLINA said she believed "Baeba" lived in Erie, PA and that LOPEZ would likely be with her. RFTF members learned that MOLINA's 2003 blue Acura was transferred to a Yaritza LAO OQUENDO in Erie, PA. I sent investigators to speak to LAO OQUENDO regarding LOPEZ, and she claimed she only recently learned that LOPEZ and his family were related to her. LOA OQUENDO said LOPEZ was technically her uncle, and that she met him once at the address she believed to be on Sumner Place in Buffalo, NY. LAO OQUENDO said finally that MOLINA transferred the car to her grandfather, and he in turn gave it to her.

19.    On October 16, 2017 the United States Attorney's Office served Grand Jury subpoenas on several airline companies in order to obtain information on LOPEZ. The results of the subpoena showed that Kiramaite MOLINA purchased several plane tickets from American Airlines between June 16 and July 8, 2017 for herself, Angel VAZQUEZ and two other unknown males to San Juan, PR.

20.    On November 16, 2017 I interviewed another of LOPEZ's brothers, Adrian LOPEZ at 147 Roesch Street, Buffalo, NY. When asked about his family members, Adrian

10

LOPEZ claimed he has a mother "Violet", but didn't know where she lived. Adrian LOPEZ was asked about his brother, and he indicated he had a brother Christian LOPEZ and Jonathan LOPEZ, but that he wasn't related to anyone by the name of Joseph LOPEZ. When shown a picture of LOPEZ, Adrian LOPEZ still claimed he did not know him.

21.     On November 21, 2017 I learned that the Snapchat account Joseph_Lopez34 is still an active account, and that LOPEZ recently accepted a "friend request" from a confidential source.

## INFORMATION ABOUT SNAPCHAT MESSAGING APPLICATION

22.     Snapchat is a messaging application for mobile devices. Using the application, users can take photos, record videos, add texts and drawings and send these to a controlled list of recipients. Some of the features of Snapchat are described below:

   a.     Snaps: A user takes a photo or video using their mobile device in real-time. The user then sets a time limit of 1-10 seconds for the receiving user(s) to view the photo or video. These photos and videos are known as "Snaps". A user can elect to have a Snap saved to their phone's photo gallery or just sent via Snapchat without being saved. The Snap can then be sent to a friend via Snapchat. After a Snap is opened and viewed by all receiving users, the content will then be hidden from the recipient's devices and deleted from Snapchat servers. If a user fails to open a Snap, the content will then be stored for 30 days on Snapchat servers. In addition to content, Snapchat also retains logs of user's Snaps sent and received for the prior 31 days.

   b.     Stories: A user can also add the photo or video Snap to their "Story". Depending on the user's privacy settings, the photos and videos added to a Story can be viewed by either all Snapchat users or just the user's friends for up to 24 hours.

   c.     Chat: A user can also type messages to friends within Snapchat using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties and both parties swipe away from the Chat

11

screen, the message will be cleared. Within the Snapchat application itself, a user can opt to save part of the Chat by tapping on the message (text or photo) that the user wants to keep. The user can clear the message by tapping it again. Content is stored on Snapchat servers if a user chooses to save a Chat, or if a user fails to open a Chat, then the content will be available for 30 days.

23.     Snapchat asks users to provide basic contact information to Snapchat, either during the registration process or thereafter. This information may include the user's full name, birth date, contact email address, physical addresses (including city, state and zip code), telephone numbers, screen names, websites and other personal identifiers. Snapchat users can select different levels of privacy for their communications and information associated with their Snapchat accounts. By adjusting these privacy settings, a Snapchat users can make information available only to him or herself, to particular users or to all Snapchat users.

24.     Social networking providers, such as Snapchat, typically retain additional information about their user's accounts. This information may include length of service, the types or services utilized and the means and source of any payments associated with the service (including credit card and bank account information). In some cases, Snapchat users may communicate directly with Snapchat about issues relating to their account, such as technical problems, billing inquiries or complaints from other users. Social networking providers, such as Snapchat, typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communication.

25.    Snapchat requires users to utilize the application on a mobile device (i.e. cellular telephone, tablet computers).  Moreover, Snapchat requires users to choose a unique username and password, so that he or she will be the sole controller of a particular Snapchat account, and have sole access to the accounts features.

26.    Therefore, the servers of Snapchat are likely to contain all the material just described, including stored electronic communication and information concerning subscribers and their use of Snapchat, such as account access information, transaction information and account application.  Moreover, Snapchat servers are likely to contain evidence of the underlying offenses, those being, Concealing a Person From Arrest, in violation of 18 USC § 1071, and Unlawful Flight to Avoid Prosecution, in violation of 18 USC § 1073, where probable cause exists was committed by LOPEZ, and others known and unknown to this investigation.  Communication sent or received from the user account Joseph_Lopez34, which is known to belong solely to LOPEZ, is likely to contain evidence of the crimes Concealing a Person From Arrest, in violation of 18 USC § 1071, and Unlawful Flight to Avoid Prosecution, in violation of 18 USC § 1073.

27.    Snapchat is considered an electronic communication service provider because it provides its users access to electronic communications services as defined in 18 USC § 2510(15).  18 USC § 2703 sets out particular requirements that the government must meet in order to obtain access or disclosure of records and other information from an electronic communication service provider.

## AUTHORIZATION REQUEST

28.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 USC § 2703(c).


29.     I further request, pursuant to 18 USC § 3103a(b) and Federal Rules of Criminal Procedure 41(f)(3), that the Court authorize the officer executing this warrant delay notice until January 27, 2018.   There is reasonable cause to believe that providing immediate notification of the existence of this warrant would have an adverse effect on the investigation as to the whereabouts of LOPEZ, as defined in 18 USC § 2705.   As such, it can be reasonably expected that the target of the investigation may destroy evidence, change patterns of behavior, notify confidents and flee further from prosecution.   As further specified in Attachment B, which is incorporated in the warrant, the proposed search warrant does not authorize the seizure of any tangible property (See 18 USC § 3103a(b)(2)).   Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 USC § 2510) or any stored wire electronic information, there is reasonable necessity for the seizure for the reasons stated above (See 18 USC § 3103a(b)(2))


30.     I further request that the Court direct Snapchat to disclose to the government any information described in Attachment A that is within the possession, custody or control of Snapchat.   I also request that the Court direct Snapchat to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference

with Snapchat services.  The government shall compensate Snapchat for reasonable expenses incurred in furnishing such facilities.

31.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing investigation that is neither public nor known to all targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize this investigation.

JAMES BONA
Deputy US Marshal
United States Marshals Service

Subscribed and sworn before

me on this _28TH_ of November, 2017

JEREMIAH J. McCARTHY
United States Magistrate Judge

15